# GERAGOS & GERAGOS

### A PROFESSIONAL CORPORATION
### LAWYERS
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600
Geragos@Geragos.com

MARK J. GERAGOS    SBN 108325
BEN J. MEISELAS    SBN 277412
GREG L. KIRAKOSIAN    SBN 294580
TYLER M. ROSS    SBN 292263

**SAMINI SCHEINBERG, LLP**
BOBBY SAMINI    SBN 181796
MATTHEW M. HOESLY    SBN 289593
840 Newport Center Dr., Suite 700
Newport Beach, CA 92660
Telephone: (949) 724-0900
Attorneys for Plaintiffs ASHLEY BOEHLER and JAMES FRIEDRICH

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ASHLEY BOEHLER, an individual; JAMES FRIEDRICH, an individual<br><br>Plaintiff,<br><br>vs.<br><br>ZILLOW, INC., a Washington corporation; and DOES 1 through 50, inclusive;<br><br>Defendants. | Case No.: 8:14-CV-01844-DOC-DFM<br><br>**PLAINTIFFS' CONSOLIDATED COMPLAINT FOR DAMAGES**<br><br>  **1. RETALIATION IN VIOLATION OF LABOR CODE § 1102.5(b);**<br>  **2. RETALIATION IN VIOLATION OF LABOR CODE § 1102.5(c);**<br>  **3. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**<br>  **4. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS;**<br>  **5. CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY;**<br>  **6. WRONGFUL TERMINATION**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

## INTRODUCTION

1.    Plaintiff Ashley Boehler and James Friedrich were employed by Defendant Zillow, Inc. ("Zillow") as Inside Sales Consultants.  Mr. Boehler began his employment with Zillow on or about September 17, 2012, and Mr. Friedrich began on or about February 15, 2013.  Shortly after beginning their employment, Mr. Boehler and Mr. Friedrich uncovered a covert advertising scheme involving fake real estate agents, fraudulent advertising sales procured by forged signatures, and numerous violations of the Real Estate Settlement Procedures Act ("RESPA").

2.    Plaintiffs reported the scheme and violations to their respective managers, who chose to turn a blind eye to continue to reap the benefits of the fraudulently inflated business being reported by to Zillow's headquarters.  Plaintiffs continually instead that Zillow take action to thwart the fraudulent conduct occurring within its own offices.

3.    After a year, Plaintiffs uncovered pervasive and widespread fraudulent conducted which was, in effect, ripping off consumers and the public.  Yet again, Plaintiffs complained to their managers who refused to take action. Thereafter, Plaintiffs notified Zillow's corporate offices of the deceptive conduct via anonymous email.  Plaintiffs' identities were later revealed and, instead of taking corrective action,  Mr. Boehler's manager warned him to "not get involved" and advised him to "stay out of matters" that were "not his business."  Similarly, Mr. Friedrich's manager told him to "drop it" and to "stop hanging out" with two other Zillow employees who also knew of the scheme—Mr. Friedrich's two best friends at Zillow.

4.    After complaining of and refusing to take part in the fraudulent scheme, Defendant Zillow and its managers engaged in a targeted campaign of retaliating against Plaintiffs. Plaintiffs suffered unfavorable personnel action(s) by being subjected to unprecedented scrutiny, alienation, harassment, reduced leads, and other measures that directly and negatively affected Plaintiff's earnings.  Ultimately Mr. Boehler was wrongfully terminated and Mr. Friedrich was constructively discharged.

Geragos & Geragos, apc
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, California 90017-3411

**PARTIES**

5.     Plaintiff Ashley Boehler, at all relevant times, was an individual residing in Orange County, California.

6.     Plaintiff James Friedrich, at all relevant times, was an individual residing in Orange County, California.

7.     Defendant Zillow, Inc. (NASDAQ: Z), at all relevant times, was a Washington corporation registered to do business in the State of California.  Zillow is an online home and real estate marketplace for homebuyers, sellers, renters, real estate agents, mortgage professionals, landlords, and property managers.  Zillow claims its database contains more than 110 million U.S. homes.  Zillow also operates the largest real estate and rental advertising networks in the country.

8.     Plaintiff is unaware of the true names and capacities of the Defendants named herein as Does 1 through 50, inclusive, and therefore sues said Defendants by such fictitious names.  Plaintiff will seek leave of court to amend this Complaint to allege the true names and capacities of said Defendants when the same are ascertained.  Plaintiff is informed and believes and thereon alleges that each of the aforesaid fictitiously named Defendants is responsible in some manner for the happenings and occurrences hereinafter alleged, and that Plaintiff's damages and injuries as herein alleged were caused by the conduct of said Defendants.

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because the amount in controversy as to Plaintiff exceeds $75,000.00 exclusive of interest and costs and because Defendant is incorporated and has its principal place of business in a state other than the state in which the named Plaintiff resides.

10.     This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. §1367.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in the Central District of California.

## **FACTUAL ALLEGATIONS**

### **Plaintiff Ashley Boehler**

12.     Mr. Boehler began his employment with Zillow on or about September 17, 2012 as an inside sales consultant.  Over the course of his employment with Zillow, Mr. Boehler successfully performed his duties and consistently met his target sales goals and other criteria established by Zillow.  In fact, Mr. Boehler was not only recognized on several occasions for excelling in the performance of his duties, but was also routinely acknowledged as one of Zillow's top sales performers at the Irvine office.

13.     Despite his universal recognition as one of Zillow's top performers and despite receiving numerous accolades from Zillow's management for his laudable track record of consistently meeting and exceeding his target sales goals, Mr. Boehler was nevertheless subjected to a hostile work environment.   The hostile work environment that Mr. Boehler was subjected to was specifically fueled by various forms of retaliatory acts taken against Mr. Boehler by Zillow in retaliation for Mr. Boehler raising several concerns with Zillow's management over certain aspects of Zillow's corporate culture, including: general working conditions, wage and hour/overtime pay issues, and most notably, numerous instances of systematic and pervasive fraudulent activity that permeated throughout Zillow's Irvine office.

### **Plaintiff James Friedrich**

14.     Mr. Friedrich began his employment with Zillow on or about February 15, 2013.  He had recently obtained a degree in Business Administration from the Marshall School of Business at the University of Southern California.  Mr. Friedrich was a model student athlete.  He graduated in only three years while excelling at water polo on both the university's team and the United States Senior National B Team.

**GERAGOS & GERAGOS, APC**
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

15.     After his undergraduate collegiate studies, Mr. Friedrich enrolled at the University of California, Irvine to pursue a master's degree.   After enrolling for classes, Mr. Friedrich was offered a position as an Inside Sales Consultant at Zillow.

16.     In recognition of the ambitious work and school schedule he would be balancing, Mr. Friedrich asked his managers at Zillow if his studies would conflict with his employment.   Zillow's managers told him, and assured him, his master's degree would not conflict with his employment.

17.     Mr. Friedrich accepted the employment offer with Zillow based in part on these assurances by Zillow's management and by the incredible opportunity he believed he was offered.   The demanding work hours and environment at Zillow forced Mr. Friedrich to put his master's degree on hold in spring 2013, shortly after he started his employment.

18.     Mr. Friedrich then devoted his attention wholeheartedly to his employment at Zillow.   He was an outstanding Inside Sales Consultant and model employee at Zillow's Irvine, California office.   Over the course of his employment, Mr. Friedrich successfully performed his duties and consistently met his target sales goals and other criteria established by Zillow.   He won numerous sales contests within his first six months and earned the "Grinder" award, recognizing him as the "Hardest Worker in Orange County."   He was the first Zillow employee in Orange County to log 500 minutes (eight hours and twenty minutes) of call time—time actually conversing with potential Zillow clients, not including time spent dialing or leaving messages—during a single work day.

19.     Despite universal recognition as one of Zillow's top performers and numerous accolades for his sales performance, Mr. Friedrich was targeted, harassed, intimidated, and ultimately unlawfully terminated upon his discovery and objection to Zillow's systematic and pervasive violations of RESPA and the fraudulent activities condoned by Zillow's management to disguise and hide such blatant violations.

### Zillow's Illegal and Fraudulent Conduct

20.    On or about June 2013, Zillow began an advertising initiative entitled the "Co-Marketing Program."   This program encouraged mortgage lenders to partially fund real estate agents' advertisements on Zillow's website in exchange for being listed as a "Preferred Lender" alongside those agents' ads.

21.    This "pay for play" arrangement allows a mortgage lender to pay Zillow for a portion of a real estate agents' advertising in exchange for that real estate agent "steering" home-buyers to that mortgage lender.

22.    Zillow's Co-Marketing Program also allows mortgage lenders to threaten to stop funding ads purchased by outside real estate agents through Zillow if the agents fail to refer enough home-buyers to the lender.

23.    While RESPA allows mortgage lenders and real estate agents to co-market in certain situations, the Act's "anti-kickback" provision strictly prohibits mortgage lenders from paying more than their pro-rata share of any joint advertising with real estate agents.   For example, a mortgage lender may not pay for more than 50% of the co-marketing costs shared between one lender and one agent, nor may a mortgage lender pay for more than 33% of the co-marketing costs shared between one lender and two agents, etc.

### Plaintiffs Discover Fraudulent Advertising Sales and RESPA Violations

24.    Mr. Boehler discovered the first of these fraudulent activities not more than two months into his employment with Zillow.   On or about December 2012, Mr. Boehler discovered that a certain member of the inside sales team at the Irvine office was involved in credit card fraud.   Specifically, the Zillow employee overcharged a customer by several hundred dollars when the customer had only purchased a $10/month advertising package with Zillow.   As a result of the scheme, the Zillow employee was able to report higher sales figures.   The Zillow employee later tried to cover up his conduct by sending the client a postal money order for the months-worth of advertising that had been billed without the client's consent.

25.     Mr. Boehler reported his discovery of the credit card fraud to Jon Boller and Edward Cornelius—two of Zillow's managers at the Irvine office.  Neither Mr. Boller nor Mr. Cornelius took any action when they were advised of the fraudulent activity.  Instead, both Mr. Boller and Mr. Cornelius cautioned Mr. Boehler to "not get involved," advised him to "stay out of matters" that were "not his business," and warned him that "circulating office rumors" would not be good for Mr. Boehler's future at Zillow.  The Zillow employee was not terminated for his fraudulent conduct.

26.     Mr. Friedrich discovered the first of these fraudulent activities on or around October 23, 2013.  Mr. Friedrich learned that numerous individual real estate agents' advertising accounts were more than 50% funded by the same mortgage lender's credit card—an arrangement that Mr. Friedrich knew to be a blatant violation of RESPA.  Mr. Friedrich knew this was a RESPA violation because Zillow's own internal guidelines specifically stated that mortgage lenders were not allowed to pay more than 50% of the co-marketing expenses.

27.     Mr. Friedrich disclosed the illegal activity and RESPA violations to his co-worker Ashley Boehler.  Mr. Boehler agreed that this illegal arrangement violated RESPA and pointed out that there were also numerous instances of contract fraud in connection to these same accounts.  Mr. Boehler discovered that the same individual who had previously been involved with the credit card fraud from a year earlier was once again involved in additional fraudulent activities.   Only this time, these additional fraudulent activities not only involved credit card fraud, but also encompassed and implicated additional fraudulent acts such as forged contracts, instances of unlicensed real estate agents consulting with Zillow clients, and even numerous RESPA violations.  The Zillow employee used these tactics to overstate his sales volume to Zillow's Irvine management, who in turn misrepresented the office's performance to Zillow's corporate office.

28.     As Mr. Boehler explained, when advertising payments were due by a real estate agent, the agent's email address would surreptitiously be changed immediately

before the advertising contract was emailed to the agent. The contract was then sent to a new, "dummy" address, signed by an unknown person, and sent back to Zillow from that same "dummy" address. Immediately thereafter, the agent's "dummy" email address in Zillow's system was switched back to the original, authentic address.

29.    Mr. Friedrich soon discovered the explanation for this irregular conduct: a Zillow employee was sending these advertising contracts to his own email address and forging the real estate agent's signature in order to drive up his advertising sales numbers. These real estate agents were then fraudulently charged for advertising they never agreed to purchase.

30.    By cross-referencing Zillow's advertising accounts with the California Bureau of Real Estate's list of licensed real estate agents, Mr. Friedrich discovered that numerous advertising accounts — supposedly held by California realtors—were not held by individuals licensed to sell real estate. In fact, these were "dummy" accounts set up and funded by mortgage lenders in order to defraud the public and obtain leads on home loans.

31.    Mr. Friedrich recognized that the public would not be able to discern whether they were in fact speaking with a licensed California real estate agent or a mortgage lender posing as one.

32.    Because of the seriousness of these misrepresentations and fraudulent activities, as well as the potential liability Zillow could face if the illegal activity continued unchecked, Mr. Friedrich called a meeting with his manager on or around October 28, 2013. Mr. Friedrich detailed the numerous RESPA violations, fraudulent contracts, and "dummy" real estate agent accounts to his manager, as well as outlined the necessary steps to resolve each issue.

33.    Mr. Friedrich's manager assured him that he would immediately address these issues with upper management, and promptly ended the meeting.

34.    In the following days, Mr. Friedrich noticed that the illegal violations continued and that no steps had been taken to remedy these issues. For several weeks,

Mr. Friedrich approached his manager informing him that the illegal activities still had not been addressed.

35.    After repeatedly brushing off Mr. Friedrich and assuring him that these issues would be addressed, his manager eventually became angry with Mr. Friedrich and demanded that he "drop it."

36.    Mr. Friedrich pressed further, and in response his manager again insisted that he "drop it," demanded that he not mention it to other employees, and to immediately "stop hanging out" with Mr. Boehler and other employees aware of Zillow's fraudulent and illegal conduct.

### Mr. Boehler Is Retaliated Against for Reporting the Fraudulent Conduct

37.    Once again, Mr. Boehler approached Zillow's local Irvine management, including his immediate manager, Cody Fagnant, with the information he had discovered.   And, once again, local management refused to take action, instead flippantly remarking that they "would look into it."

38.    Because of the seriousness of the fraudulent activities as well as the potential liability that Mr. Boehler feared Zillow could be faced with if these issues were not immediately addressed and rectified by Zillow's management, Mr. Boehler began compiling documentation that correlated to the additional fraudulent activities and events that he had discovered in October, 2013.

39.    About a month later, on or about November 4, 2013, Mr. Boehler sent an anonymous email entitled "Immediate Attention Needed" from an account entitled "thezillowway@gmail.com" to several Zillow executives, including members of Zillow's own executive team at the local Irvine office as well members of upper management in Zillow's corporate office in Seattle.   The email contained the documentation that Mr. Boehler had compiled relating to the additional fraudulent activities that Mr. Boehler had recently uncovered.  A portion of that email follows:

> This matter needs immediate attention. Our entire company, our
> Premier Agent product, and the lender co-marketing program

could be at risk.  Local management has been informed of these accounts over one month ago and refuses to take action.  Numerous employees have complained…no action has been taken…it seems as if management has actively chosen to look the other way, or simply refuse to investigate for themselves.  We have major RESPA violations happening.  We have agents not licensed to service our customers as Premier Agents.  We have what appear to be forged contracts being signed.

40.    Shortly after anonymously emailing the documentation to several Zillow executives, Mr. Boehler came forward and revealed his identity only to Zillow's upper management in Seattle.   It was thereafter that Mr. Boehler received an email on November 15, 2013 from Mr. Chad Cohen, the CFO of Zillow at Zillow's corporate office in Seattle, assuring Mr. Boehler that his name will be kept confidential and that the types of fraudulent activities that Mr. Boehler had brought to light "must never be tolerated."  The content of that email is set forth below:

We will keep this confidential and thank you again for your hard work pulling this together.  It is brave of you to come forward.  These types of activities must never be tolerated.  You folks should go home this weekend knowing that you did absolutely nothing wrong.

41.    As a result of Mr. Boehler raising his concerns about the pervasive fraudulent activities in his anonymous email, Zillow's upper management eventually took action and certain Zillow employees were terminated.

42.    Unfortunately, and despite the direct assurances by Zillow's CFO that his identity would remain confidential, Mr. Boehler began to gradually suffer retaliation from Zillow's management in the Irvine office on account of Mr. Boehler's efforts to expose the pervasive fraudulent activity.  Instances of Zillow's retaliation against Mr. Boehler include, but are not limited to:

a.  Mr. Boehler was "written up" and issued "poor reviews" for his work by upper management, despite the fact that Mr. Boehler consistently

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

1  outperformed other Inside Sales Consultants and was one of the top

2  performers in Zillow's Irvine office.

3  b. Zillow management reallocated high-value "inbound leads" from Mr.

4  Boehler to other Inside Sales Consultants, with lesser tenure and

5  performance compared to Mr. Boehler, without explanation.  "Inbound

6  leads" are sales calls coming from clients who are interested in

7  purchasing advertising and are the most effective way to reach the

8  demanding sales quotas set by Zillow's management.  Notably, Zillow's

9  managers have complete and unbridled discretion to allocate "inbound

10  leads" as they please.

11  c. Mr. Boehler was removed, without his knowledge, from the "inbound

12  queue" for several months before being arbitrarily "reinstated" back into

13  the queue.  The "inbound queue" is the system by which "inbound leads"

14  are assigned to an Inside Sales Consultant.  An employee that is removed

15  from the "inbound queue" is not assigned "inbound leads."

16  d. Similarly, Zillow managers arbitrarily gave other Inside Sales

17  Consultants more valuable "reassigned clients."  "Reassigned clients" are

18  clients that were assigned to other Zillow Inside Sales Consultants who

19  had since been terminated.

20  e.  The retaliatory reduction in Mr. Boehler's "inbound leads" and

21  "reassigned clients," especially in light of his stellar work performance,

22  severely impaired his ability to generate sales numbers comparable to his

23  peers who received the usual amount of inbound leads and valuable

24  reassigned clients.

25  f. Mr. Boehler won several office "contests" for his exceptional sales

26  performance.  These "contests" were designed to motivate Inside Sales

27  Consultants and were accompanied by awards and/or prizes.  These

28

awards and prizes were stripped from Mr. Boehler without explanation despite winning the contests.

g. Zillow management purposely did not consider Mr. Boehler for advancement opportunities.  On two separate occasions when existing managers departed the company, Zillow instead chose to promote other Inside Sales Consultants with inferior performance compared to Mr. Boehler.

h. Zillow managers emailed, text messaged, and communicated excessively with Mr. Boehler during his non-holiday vacation time in July and August, 2014.

i. In August, 2014, Mr. Boehler was entitled to a portion of a sales commission earned with another Inside Sales Consultant according to Zillow's rules of engagement.  Mr. Boehler's manager at the time, Gabe Schmidt, told Mr. Boehler he was "lucky" to receive half of the commission because "Doug [Slotkin] makes the decisions and Doug doesn't like you."  Doug Slotkin is Zillow's Corporate Vice President of Local Advertising Services and Director of Inside Sales for the Irvine office.  Mr. Slotkin makes the ultimate decision which Inside Sales Consultants receive credit for disputed sales.

j. Mr. Boehler brought numerous workplace issues to the attention of his manager, Mr. Schmidt.  For example, Zillow required its employees to work more than eight hours a day without compensation for those additional hours.  Zillow also took away its employees' chairs and required them to stand for up to three hours, without sitting, during an intense period of sales call known as the "blitz" or the "wave."  In response, Mr. Schmidt told Mr. Boehler that he could "man up or move out."  Mr. Boehler noticed on social media that Mr. Schmidt dined with Mr. Jon Boller that evening.  The next day, Mr. Boller informed Zillow

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

human resources that they "need to start a file on AB" because "there were numerous instances of him being non Zillow way and we need to document."  Mr. Boehler again brought these issues to Zillow's human resources department's attention, who assured Mr. Boehler they would investigate but took no meaningful action.

k. On September 3, 2014, Mr. Jon Boller actively tried to block a $20,000.00 sale that Mr. Boehler had secured.  Despite the fact that Mr. Boehler's client was one of his largest and most tenured clients, and that Mr. Boehler had an email confirmation from the client and real estate agent agreeing to the sale, Mr. Boller refused to allow the sale to go through unless he spoke directly with the client.  Mr. Boller knew at the time that the client was on vacation in Aruba with little cell phone service.  This was completely inconsistent with Zillow's ordinary sales practices.

l. Zillow also consistently miscalculated Mr. Boehler's commissions, and Zillow delayed in responding to and investigating Mr. Boehler's complaints regarding the calculations of his commissions.

m. Mr. Boehler was consistently micromanaged and his daily tasks were closely scrutinized by several members of Zillow's management team. Mr. Boehler had formerly enjoyed freedom from such overbearing scrutiny.  For example, Mr. Boehler was placed on an "activity plan," despite continuing to achieve office-leading sales numbers, and forced to email a daily report of all of his phone calls and conversations to his manager and human resources.  Mr. Jon Boller also started listening in on Mr. Boehler's phone calls in order to reprimand him later for any possible reason.

n.   Mr. Boehler received numerous closed-door "disciplinary pep talks" from Zillow's management team for various "minor issues" and typically innocuous events.

o.   In January, 2015, Mr. Boehler complained again to human resources that his "inbound leads" had decreased substantially and without explanation. The human resources representative agreed to pass along the complaint to Doug Slotkin.  Zillow has not yet responded to that complaint.

p.   In January, 2015, Mr. Boehler should have received an award for being the top performing salesperson in Zillow's Irvine office, and fifth-highest performing salesperson nationwide, during the month of December, 2014.  Every month, Zillow routinely awards the previous month's top sales performers during an office-wide meeting.  Zillow management refused to award Mr. Boehler the recognition he deserved for his accomplishments.

43.   Several of these instances are memorialized by reference to various email correspondence between Mr. Boehler and Zillow Management.

a.   In an email dated July 2, 2014, Mr. Gabe Schmidt referenced one of numerous conversations that took place between Zillow management and Mr. Boehler wherein Mr. Boehler received intense and arguably excessive scrutiny of his job performance wherein Mr. Boehler had never before been scrutinized or admonished like that.

b.   In an email chain starting on August 21, 2014, Mr. Boehler demonstrates how Zillow management overrides the stated rules of engagement for a sales account by giving the sale to another representative even though Mr. Boehler had initiated the contact.

c.   In an email dated August 5, 2014, Mr. Gabe Schmidt confirmed to Mr. Boehler that "I put you back in the [inbound] queue" for which Mr. Boehler had done absolutely nothing wrong to warrant his removal in the

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

first place.  The inbound queue is a pivotal device for sale representatives such as Mr. Boehler who rely on the leads found in the "queue" to more quickly and efficiently identify and pursue potentially lucrative sales.

d. On August 25, 2014, Mr. Boehler was reprimanded by Gabe Schmidt for "spending too much time with a new client."

44.   Zillow management has engaged in a repeated and systematic pattern to cause severe emotional distress to Mr. Boehler.  Zillow's managers will stop at nothing to embarrass, discriminate, and humiliate Mr. Boehler in an attempt to force him to quit his job.  As a result of the conduct alleged above, Mr. Boehler suffered and continues to suffer from severe emotional distress which has resulted in physical manifestations.  Specifically, Mr. Boehler has suffered and continues to suffer from debilitating depression, anxiety, exhaustion, and insomnia.

45.   Mr. Boehler has been outcast from the social environment at Zillow and made to feel like an outsider.  Despite excelling at his job, the conduct of Zillow's managers as described above was designed to morally and emotionally cripple Mr. Boehler.  As a result, Mr. Boehler now suffers from depression.  The depression and isolation he feels at work has spilled over into his personal life, and the conduct of Zillow's managers has caused Mr. Boehler to ostracize himself from social interaction.  His personal relationships suffer increasingly as Zillow's manager's retaliatory conduct escalates.

46.   In addition, Mr. Boehler has difficulty sleeping at night because he constantly fears he will be publicly berated and yelled at during the next day's "blitz" or "wave."  Zillow managers have also retaliated against Mr. Boehler by raising his sales quota over fifty percent (50%), while simultaneously taking away "inbound leads" and "reassigned clients," in order to make Mr. Boehler's job as difficult as possible for him.  Mr. Boehler's insomnia is caused by the constant pressure he feels to succeed in a nearly impossible work environment that is made hostile by his supervisors.  This pressure has also caused Mr. Boehler to suffer weekly panic attacks.

47.     Prior to September, 2014, Mr. Boehler was a healthy individual.  As a result of Zillow's retaliatory and harassing conduct, Mr. Boehler now suffers from frequent flu-like symptoms requiring medical attention.  The nearly-impossible and retaliatory job expectations placed on Mr. Boehler by Zillow, such as his "call time" and "quota," have made missed work days inexcusable, further eradicating Mr. Boehler's health.

48.     As the foregoing demonstrates, Mr. Boehler was repeatedly subjected to retaliatory tactics by Zillow in the pretext of constant scrutiny and micromanagement of Mr. Boehler's duties.  Prior to stepping forward and courageously reporting the pervasive fraudulent activities to Zillow's upper management team in its corporate offices in Seattle, Mr. Boehler had never been subjected to such aforementioned retaliatory tactics utilized by Zillow's management team at the Irvine office.

49.     On February 1, 2015, Zillow continued their retaliatory campaign against Mr. Boehler by both increasing Mr. Boehler's required sales quota while simultaneously depriving him of sales leads which would allow him the possibility of meeting the newly increased sales quota.  Prior to the targeted and retaliatory sales quota increase, Mr. Boehler had only missed three monthly quotas during his twenty-nine months of employment.  Zillow purposefully raised Mr. Boehler's monthly quota to frustrate his ability to meet his required quota and fabricate "proper grounds" for termination.  Zillow also simultaneously assigned him "unworkable" inbound sales leads – contract information for individuals who are not real estate agents or are outside of Mr. Boehler's service area – to further frustrate Mr. Boehler's ability to meet his increased quota.  Zillow's conduct was committed with full knowledge that even Mr. Boehler, one of Zillow's most successful sales consultants, would be unable to meet the unreasonable sales quota demands.  On April 1, 2015, Mr. Boehler complained of Zillow's retaliatory conduct.  On May 6, 2015, Zillow terminated Mr. Boehler's employment under the clearly pretextual basis that he was unable to meet his sales quota.

**Mr. Friedrich is Retaliated Against for Reporting Fraudulent Conduct**

50.     Shocked at his manager's demands, Mr. Friedrich informed his two friends that he had been instructed to no longer speak with them.   When Mr. Friedrich's manager learned that Mr. Friedrich had discussed this issue, he screamed at Mr. Friedrich explaining that he "can't believe [Mr. Friedrich] would fucking tell them" that he had been instructed to keep silent.  Mr. Friedrich was extremely upset by this outburst, and was nearly brought to tears by his manager's attempt to bludgeon him into silence.

51.     Because Zillow's management team had attempted to censor Mr. Friedrich and failed to address the widespread fraud and deception as described herein, Mr. Friedrich and Mr. Boehler informed Zillow's executive team in Seattle about the pervasive fraud and illegality occurring at the Irvine office.

52.     On or about November 4, 2013, Mr. Friedrich and Mr. Boehler sent an anonymous "whistle-blower" email to Zillow's headquarters describing the fraud and RESPA violations occurring in Zillow's Irvine office, as well as detailed documentary evidence supporting their concerns.  A portion of that email follows:

> This matter needs immediate attention. Our entire company, our Premier Agent product, and the lender co-marketing program could be at risk.  Local management has been informed of these accounts over one month ago and refuses to take action. Numerous employees have complained…no action has been taken…it seems as if management has actively chosen to look the other way, or simply refuse to investigate for themselves. We have major RESPA violations happening.  We have agents not licensed to service our customers as Premier Agents.  We have what appear to be forged contracts being signed.

53.     Shortly after his identity was disclosed to Zillow's executive team, Mr. Friedrich suffered numerous retaliatory actions at the hands of the Irvine management team.  He was immediately micromanaged at an unprecedented level by his superiors,

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

who greatly reduced his freedom to operate at Zillow.  For example, management drastically reduced the number of "inbound leads" allocated to Mr. Friedrich. "Inbound leads" are sales calls coming from clients who are interested in purchasing advertising and are the most effective way to reach the demanding sales quotas set by Zillow's management.  Notably, Zillow's managers have complete and unbridled discretion to allocate "inbound leads" as they please.

54.   The retaliatory reduction in Mr. Friedrich's "inbound leads," especially in light of his stellar work performance, severely impaired his ability to generate sales numbers comparable to his peers who received the usual amount of inbound leads.

55.   Nonetheless, Mr. Friedrich kept his sales numbers up only to witness numerous co-workers who generated lower sales numbers enjoy promotions that were never offered to him.  Zillow's Director of Sales in Orange County even denied, without legitimate explanation, Mr. Friedrich the ability to take paid time off in April 2014.  Mr. Friedrich previously enjoyed a friendly relationship with the Director of Sales prior to exposing the office's fraudulent activities to Zillow's executive team. After Mr. Friedrich reported the wrongful conduct described herein, the Director of Sales refused to speak to him.

56.   As a result of this pervasive and systematic pattern of harassment and retaliation, Mr. Friedrich suffered approximately twenty (20) severe and complete emotional breakdowns and approximately ten (10) panic attacks while at work. Between approximately November, 2013 and March, 2014, Zillow's retaliation caused Mr. Friedrich to openly weep and wholly lose control of his emotions, as consistently witnessed by his manager, Cody Fagnant, and another manager, Tyler Robertson.  Yet another manager, Jami Thomas, openly mocked Mr. Friedrich's breakdowns and panic attacks, facetiously cooing at him and making sarcastic and demeaning remarks.

57.   Between approximately November 2013 and March 2014, Zillow's retaliatory actions consistently caused Mr. Friedrich such severe anxiety and grief that he was unable to sleep regularly or maintain an adequate exercise schedule.  As noted

above, Mr. Friedrich is a world-class athlete—he was a member of the United States National water polo team and competes in jiu-jitsu martial arts on an international level.  Zillow's repeated harassment and retaliation caused Mr. Friedrich such severe sleeplessness and anxiety that he was unable to regularly exercise or compete at the level he was accustomed to.

58.   Finally, as a direct result of Zillow's blatant retaliation for bringing fraudulent and illegal activity to its attention, Mr. Friedrich was forced to resign in May 2014.

## **FIRST CAUSE OF ACTION**

### **RETALIATION IN VIOLATION OF LABOR CODE § 1102.5(b)**

### **(Plaintiffs Boehler and Friedrich against All Defendants)**

59.   Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

60.   Plaintiffs engaged in protected activity by repeatedly complaining of violations and fraudulent activities that Defendant and several of its employees were engaged in.

61.   Defendant failed to address Plaintiffs' concerns on numerous occasions.

62.   On or around November 4, 2013, Plaintiffs also sent an anonymous "whistle-blower" email to Zillow's headquarters describing the rampant and ongoing RESPA violations occurring in Zillow's Irvine office, as well as detailed documentary evidence supporting their concerns.

63.   Plaintiffs had reasonable cause to believe that Defendant's constant fraudulent activities would result in noncompliance with the Real Estate Settlement Procedures Act pursuant to 12 U.S.C. § 2607, including other potential illegal activity.

64.   As a result of Plaintiffs' disclosures to Zillow's headquarters of Defendant's pervasive and fraudulent activity, Plaintiff suffered unfavorable personnel action(s) by being subjected to unprecedented scrutiny and alienation,

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

harassment, reduced leads, and other measures that directly and negatively affected Plaintiff's earnings.

65.    The protected activity was the contributing factor in the unfavorable personnel action as set forth above, which invariably affected the outcome of Defendant's decision to exercise such an unfavorable personnel action(s) against Plaintiffs.

66.    Defendant cannot and will not be able to prove by clear and convincing evidence that such unfavorable employment actions as set forth above would have been taken in the absence of Plaintiffs' protected behavior and/or conduct in reporting Defendant's pervasive fraudulent activities to Zillow's headquarters.

67.    Defendant Zillow ratified its agents, servants, employees, and authorized representatives' unlawful conduct and behavior as described herein by: (1) allowing the pervasive fraudulent activity to occur without rectifying it despite repeated attempts by Plaintiffs to call it to Defendant's attention; (2) condoning the pervasive fraudulent activities by failing to act upon Plaintiffs' requests; and (3) condoning the retaliatory measures taken against Plaintiffs by failing to intervene and halt the behavior and actions of Defendant's management team in the Irvine office.

68.    As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiffs have suffered past and future special damages, including impairment of reputation and personal humiliation, past and future general damages in an amount according to proof at trial. Plaintiffs have been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

69.    In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiffs' health, rights, and well-being, and intended to subject Plaintiffs to unjust hardship, thereby warranting an

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## SECOND CAUSE OF ACTION

### RETALIATION IN VIOLATION OF LABOR CODE § 1102.5(c)

### (Plaintiffs Boehler and Friedrich against All Defendants)

70.     Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

71.     Plaintiffs had reasonable cause to believe that Defendant's constant fraudulent activities would result in noncompliance with the Real Estate Settlement Procedures Act pursuant to 12 U.S.C. § 2607.

72.     Plaintiffs were employed as Inside Sales Consultants and were required to sell real estate-based advertising.  Plaintiffs learned that, in their role as Inside Sales Consultants, Plaintiffs were forced to be a part of Defendant Zillow's scheme of advertising which was more than 50% funded by mortgage lenders, in violation of RESPA and Zillow's internal guidelines.

73.     Upon learning of the scheme and the RESPA violations, Plaintiffs refused to participate further.  Plaintiffs engaged in a protected activity when Plaintiffs refused to engage in the pervasive and fraudulent activities that Defendant and its employees were engaged in.

74.     As a result of Plaintiffs' refusal to engage in Defendant's pervasive and fraudulent activity, Plaintiffs suffered unfavorable personnel action(s) by being subjected to unprecedented scrutiny and alienation, harassment, reduced leads, and other measures that directly and negatively affected Plaintiffs' earnings.

75.     The protected activity was the contributing factor in the unfavorable personnel action as set forth above, which invariably affected the outcome of Defendant's decision to exercise such an unfavorable personnel action(s) against Plaintiffs.

76.     Defendant cannot and will not be able to prove by clear and convincing evidence that such unfavorable employment actions as set forth above would have been taken in the absence of Plaintiffs' protected behavior and/or conduct in refusing to engage in Defendant's pervasive fraudulent activities.

77.     As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiffs have suffered past and future special damages, including impairment of reputation and personal humiliation, past and future general damages in an amount according to proof at trial. Plaintiffs have been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

78.     In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## THIRD CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Plaintiffs Boehler and Friedrich against All Defendants)

79.     Plaintiff realleges and incorporates as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

80.     Defendants' conduct, as described above, was extreme and outrageous and beyond the bounds of decency tolerated in a civilized society.

81.     Defendants' conduct was intended to cause Plaintiff emotional distress and Defendant acted with a reckless disregard to the probability that Plaintiff would suffer emotional distress.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

82.     Defendant Zillow ratified its agents, servants, employees, and authorized representatives' unlawful conduct and behavior as described herein by: (1) allowing the pervasive fraudulent activity to occur without rectifying it despite repeated attempts by Plaintiff to call it to Defendant's attention; (2) condoning the pervasive fraudulent activities by failing to act upon Plaintiff's requests; and (3) condoning the retaliatory measures taken against Plaintiff by failing to intervene and halt the behavior and actions of Defendant's management team in the Irvine office.

83.     Plaintiffs suffered severe emotional distress as a result of the retaliatory conduct by Zillow's managers, which was made in response to Plaintiffs raising complaints regarding ongoing pervasive fraudulent conduct at Zillow and other general working conditions.

84.     As a result of the conduct alleged above, Plaintiff Boelhler suffered and continues to suffer severe emotional distress which has resulted in physical manifestations of such distress.   Specifically, Plaintiff suffers from debilitating depression, insomnia, exhaustion, loneliness, weekly panic attacks, and deteriorating health.

85.     As a result of the conduct alleged above, Mr. Friedrich suffered approximately twenty (20) severe and complete emotional breakdowns and approximately ten (10) panic attacks while at work.   Between approximately November 2013 and March 2014, Zillow's retaliation caused Mr. Friedrich to openly weep and wholly lose control of his emotions, as consistently witnessed by his manager, Cody Fagnant, and another manager, Tyler Robertson.   Yet another manager, Jami Thomas, openly mocked Mr. Friedrich's breakdowns, facetiously cooing at him and made sarcastic and derogatory remarks.

86.     Between approximately November 2013 and March 2014, Zillow's retaliatory actions consistently caused Mr. Friedrich such severe anxiety and grief that he was unable to sleep regularly or maintain an adequate exercise schedule.   As noted above, Mr. Friedrich is a world-class athlete—he was a member of the United States

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

National water polo team and competes in jiu-jitsu martial arts on an international level.  Zillow's repeated harassment and retaliation caused Mr. Friedrich such severe sleeplessness and anxiety that he was unable to regularly exercise or compete at the level he was accustomed to.

87.    Defendant was a substantial factor in causing Plaintiffs' severe emotional distress.

88.    As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiffs have suffered past and future special damages and past and future general damages in an amount according to proof at trial. Plaintiffs have been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

89.    In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiffs' health, rights, and well-being, and intended to subject Plaintiffs to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## FOURTH CAUSE OF ACTION

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Plaintiffs Boehler and Friedrich against All Defendants)

90.    Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

91.    Defendant owed a duty to use reasonable care in its conduct with regard to the health, safety, and rights of Plaintiffs.  It was foreseeable and probable that Plaintiffs would suffer severe emotional distress from Defendant's conduct.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

92.     Defendant was negligent by breaching the duty of care it owed to Plaintiffs when Defendant's agents, employees, and representatives repeatedly harassed, reprimanded, discouraged, and intimidated Plaintiffs, and Defendant was aware of such conduct by its agents, employees, and representatives and allowed it to continue.

93.     Defendant Zillow ratified its agents, servants, employees, and authorized representatives' unlawful conduct and behavior as described herein by: (1) allowing the pervasive fraudulent activity to occur without rectifying it despite repeated attempts by Plaintiffs to call it to Defendant's attention; (2) condoning the pervasive fraudulent activities by failing to act upon Plaintiffs' requests; and (3) condoning the retaliatory measures taken against Plaintiffs by failing to intervene and halt the behavior and actions of Defendant's management team in the Irvine office.

94.     Plaintiffs suffered severe emotional distress as a result of the retaliatory conduct by Zillow's managers, which was made in response to Plaintiffs raising complaints regarding ongoing pervasive fraudulent conduct at Zillow and other general working conditions.

95.     As a result of the conduct alleged above, Plaintiff Boelhler suffered and continues to suffer severe emotional distress which has resulted in physical manifestations of such distress.   Specifically, Plaintiff suffers from debilitating depression, insomnia, exhaustion, loneliness, weekly panic attacks, and deteriorating health.

96.     As a result of the conduct alleged above, Mr. Friedrich suffered approximately twenty (20) severe and complete emotional breakdowns and approximately ten (10) panic attacks while at work.   Between approximately November 2013 and March 2014, Zillow's retaliation caused Mr. Friedrich to openly weep and wholly lose control of his emotions, as consistently witnessed by his manager, Cody Fagnant, and another manager, Tyler Robertson.   Yet another

manager, Jami Thomas, openly mocked Mr. Friedrich's breakdowns, facetiously cooing at him and made sarcastic and derogatory remarks.

97.     Between approximately November 2013 and March 2014, Zillow's retaliatory actions consistently caused Mr. Friedrich such severe anxiety and grief that he was unable to sleep regularly or maintain an adequate exercise schedule.  As noted above, Mr. Friedrich is a world-class athlete—he was a member of the United States National water polo team and competes in jiu-jitsu martial arts on an international level.  Zillow's repeated harassment and retaliation caused Mr. Friedrich such severe sleeplessness and anxiety that he was unable to regularly exercise or compete at the level he was accustomed to.

98.     Defendant was a substantial factor in causing Plaintiffs' severe emotional distress.

99.     As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiffs have suffered past and future special damages and past and future general damages in an amount according to proof at trial. Plaintiffs have been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

100.   In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**FIFTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Plaintiff Friedrich against All Defendants)**

101.   Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporate the same herein by this reference as though set forth in full.

102.  Constructive discharge occurs when the employers conduct is so egregious that it effectively causes the employee to resign. The employer must either intentionally create or knowingly permit working conditions that are so intolerable at the time of the employee's resignation, that a reasonable person in the employee's position would be compelled to resign.

103.   It is the express fundamental public policy of the State of California that employers may not retaliate against employees because of their reporting of said misconduct.

104.   As noted above, Defendant retaliated against Plaintiff. Defendant's conduct continued until Plaintiff was forced to terminate his employment because of the hostile work environment.

105.   Plaintiff was subjected to such severe, widespread, and persistent harassment and retaliatory conduct that a reasonable employee would have considered his work environment to be abusive.   Accordingly, Plaintiff's resignation with Defendant effectively constituted constructive termination of his employment.

106.   Defendant's constructive termination of Plaintiff's employment—as a direct result of Plaintiff's reporting of Defendant's misconduct—constitutes a wrongful employment termination in violation of California's fundamental public policy.

107.   As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiff has suffered past and future special damages, including impairment of reputation and personal humiliation, past and future general

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

damages in an amount according to proof at trial. Plaintiff has been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

108. In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## SIXTH CAUSE OF ACTION

## WRONGFUL TERMINATION

### (Plaintiff Boehler against All Defendants)

109. Plaintiffs reallege and incorporate as if fully stated herein each and every allegation contained above and incorporates the same herein by this reference as though set forth in full.

110. As alleged above, Plaintiff engaged in protected activity by repeatedly complaining of violations and fraudulent activities that Defendant and several of its employees were engaged in. Specifically, Plaintiff complained of Defendant's noncompliance with the Real Estate Settlement Procedures Act pursuant to 12 U.S.C. § 2607, including other potential illegal activity.

111. As a result of Plaintiffs' disclosures to Zillow's headquarters of Defendant's pervasive and fraudulent activity, Plaintiff suffered unfavorable personnel action(s) by being terminated Plaintiff's employment on or around May 6, 2015.

112. Plaintiff's complaints of fraudulent activity, RESPA violations, and refusal to participate in the activity was the substantial motivating reason for his termination. Plaintiff's termination was rooted in violation of public policy embodied in California's Fair Employment and Housing Act (FEHA), California Government

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

Code §12940, *et seq.*, California Constitution Art. I Section 8, and case law. Specifically, California has a strong public policy against terminating individuals who report illegal conduct of its employers.  Additionally, Zillow has a pattern and practice of wrongfully terminating other employees in violation of public policy.

113.   Defendant cannot and will not be able to prove by clear and convincing evidence that such unfavorable employment actions as set forth above would have been taken in the absence of Plaintiffs' protected behavior and/or conduct in reporting Defendant's pervasive fraudulent activities to Zillow's headquarters.

114.   As a direct and proximate cause of the tortious, unlawful, and wrongful acts of Defendant and its respective agents, servants, employees, and authorized representatives as aforesaid, Plaintiff has suffered past and future special damages, including impairment of reputation and personal humiliation, past and future general damages in an amount according to proof at trial. Plaintiff has been damaged emotionally and financially, including but not limited to emotional suffering from emotional distress and ridicule, as well as loss of income and earnings potential.

///

///

115.  In engaging in the conduct as hereinabove alleged, Defendant and its agents, servants, employees, and authorized representatives acted with malice, fraud, and oppression and/or in conscious disregard of Plaintiff's health, rights, and well-being, and intended to subject Plaintiff to unjust hardship, thereby warranting an assessment of punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Ashley Boehler and James Friedrich respectfully requests for judgment to be entered upon Defendant Zillow, Inc. as follows:

1.  For general and special damages for an amount to be determined at trial;

2.  For pre- and post-judgment interest according to proof;

3.  For Punitive Damages where applicable;

4.  For Attorney Fees where applicable;

3.  For costs of suit incurred herein; and

4.  For all other relief as this court may deem proper.

DATED:  June 22, 2015

GERAGOS & GERAGOS, APC
SAMINI SCHEINBERG, PC


By:  /s/ MARK J. GERAGOS
     MARK J. GERAGOS
     BEN J. MEISELAS
     GREG L. KIRAKOSIAN
     TYLER M. ROSS
     BOBBY SAMINI
     NICOLE PRADO
     MATTHEW M. HOESLY
     Attorneys for Plaintiffs
     ASHLEY BOEHLER and
     JAMES FRIEDRICH

GERAGOS & GERAGOS, APC
HISTORIC ENGINE CO. NO. 28
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411

**DEMAND FOR JURY TRIAL**

Plaintiffs Ashley Boehler and James Friedrich hereby demands a jury trial.

DATED:  June 22, 2015

**GERAGOS** & **GERAGOS, APC**
**SAMINI SCHEINBERG, PC**


By:   /s/ MARK J. GERAGOS
MARK J. GERAGOS
BEN J. MEISELAS
GREG L. KIRAKOSIAN
TYLER M. ROSS
BOBBY SAMINI
NICOLE PRADO
MATTHEW M. HOESLY
Attorneys for Plaintiffs
ASHLEY BOEHLER and
JAMES FRIEDRICH